**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 23 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMES LLOYD WOODLEE, GARY
WOODLEE, and ROBERT KINSLOW,

      Defendants-Appellants.

Nos. 97-7032, 97-7033 & 97-7034

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-96-45-S)

Donn F. Baker, Baker & Baker, Tahlequah, Oklahoma, for Appellant James Lloyd Woodlee.

James G. Wilcoxen, Wilcoxen, Wilcoxen & Primomo, Muskogee, Oklahoma, for Appellant Gary Don Woodlee.

Stephen J. Knorr, Federal Public Defender, and Stephen J. Greubel, Assistant Federal Public Defender, Tulsa, Oklahoma, on the brief for Appellant Robert Kinslow.

Michelle M. Aronowitz (Isabelle Katz Pinzler, Acting Assistant Attorney General, and David K. Flynn, Attorney, with her on the briefs), Attorney, Civil Rights Division, Department of Justice, Washington, D.C., for Appellee United States of America.

Before **PORFILIO**, **HOLLOWAY,** and **HENRY**, Circuit Judges.

**PORFILIO**, Circuit Judge.

_____

These three appeals arise from the same racially charged incident; therefore, we join them for the purpose of this opinion. James Woodlee appeals his conviction for violent interference with federally protected activity, contending: (1) there was insufficient evidence to support his conviction; (2) the court erred during sentencing; (3) the court erred when it allowed testimony regarding prior conduct; and (4) the government's **Brady** and **Jencks Act** violations warrant a new trial. Gary Woodlee raises similar sufficiency of the evidence and sentencing arguments. In addition, Gary Woodlee maintains the court erred when it refused to admit or consider polygraph evidence during his sentencing.

Defendant Robert Kinslow appeals the court's application of a hate crime enhancement to increase his sentence. Mr. Kinslow maintains: (1) the court applied an incorrect legal standard when implementing the enhancement; and (2) the facts do not support the use of the enhancement. Because we believe there is sufficient evidence to support the Woodlees' convictions and the court did not err during trial or sentencing of any of the defendants, we affirm.

David Carter and Tim Walker, two black men, entered the Stumble Inn, a bar in Ft. Towson, Oklahoma, where Gary Woodlee, James Woodlee, and three of their friends, all

white, were drinking and shooting pool. Upon seeing Mr. Carter and Mr. Walker enter, James Woodlee said to one of his friends, "What do those n-----s think they are doing coming in here?"

After ordering a beer, Mr. Carter placed some quarters on the pool table to signal he was next to play. When his turn came, however, Gary Woodlee insisted it was not Mr. Carter's turn. After a brief argument, Mr. Carter relented and decided to leave the bar. As Mr. Carter and Mr. Walker climbed into their car, James Woodlee followed them outside and yelled, "That's right, you black mother f-----s, get on out of here." Mr. Carter and Mr. Walker drove off without responding. As he returned to the bar, James Woodlee bragged, "I got rid of those black mother f-----s; didn't I?"

Later that evening, Mr. Carter and Mr. Walker returned to the Inn with another friend, Brock Lockhart, who is also black. The Woodlees and their friends were still at the bar, and for the remainder of the night they racially taunted the black men with statements such as: "Look at the black son-of-a-b-----s" and "[w]oo, that sure is a stinking n-----." At one point, while aiming at the eight-ball but looking at Mr. Carter and his friends, Gary Woodlee yelled he "was going to shoot the s--- out of that black son-of-a-b----." Throughout the entire evening, Mr. Carter, Mr. Walker, and Mr. Lockhart never approached the defendants or responded to the racial taunting.

Finally, when the bartender saw James Woodlee give Gary Woodlee a nine millimeter pistol, she decided to close the bar. She testified that Gary Woodlee said he

would use the gun on "them black son of a b-----s" and "s--- is going to go down and it ain't going to be a pretty sight." Mr. Carter and his friends apologized to the bartender for the inconvenience and offered to leave so the bar could stay open.

Mr. Carter and his friends were the first to leave the bar. As they walked to their car, the group of white men followed them outside and the racial taunting and threatening spilled over into the parking area. The three black men got into Mr. Carter's car and drove toward home. As they drove away, Mr. Lockhart shouted, "You guys are a bunch of a------s."

Buddy Vandever, a friend of the Woodlees who had been in the bar, entered his truck, pulled out directly behind Mr. Carter's car, and began a high speed chase. Gary Woodlee and James Woodlee got into their truck to join in the pursuit. Before pulling out of the parking lot, they invited another friend, Robert Kinslow, to accompany them. Prior to joining the Woodlees, Mr. Kinslow retrieved from his own car a Mini 14, .223 rifle with a scope and 20 round clip. Then, with Gary Woodlee driving, James Woodlee straddling the gear shift, and Mr. Kinslow in the passenger seat, the trio took up the chase.

Approximately, one half-mile down the road, Mr. Vandever's truck pulled off to the side of the road. Gary Woodlee slowed for a second, then continued the chase. Suddenly, Mr. Kinslow rolled down the passenger window, aimed the rifle at Mr. Carter's

car, and fired between three and six shots.[1]  The shots shattered the rear window of the car, and Mr. Carter, who was sitting in the back seat, was thrown from his seat.  After the driver lost control of the car and it slid into a ditch, the three men ran to a nearby house to escape further harm.

Later examination revealed Mr. Carter had holes in his shirt and baseball cap consistent with either shotgun pellets or fragmented bullets.  In addition, he had been shot in the eye and had several pellets lodged in his head, face, and back.  The treating physician described the metal fragment in his eye as a pellet or possibly a fragment of a bullet.  The fragment was removed from his eye in an out-patient surgical procedure.  As a result of the shooting, Mr. Carter's retina is permanently scarred.  He has a permanent spot in his field of vision, experiences blurriness, and has an increased risk of retinal detachment.  The other two men received minor injuries.

Gary Woodlee, James Woodlee, Mr. Vandever, and Mr. Kinslow were all charged with conspiracy to interfere with federal rights and three counts of violent interference with federally protected activities resulting in bodily injury.  In addition, Mr. Kinslow was charged with use of a firearm during the commission of a crime of violence.  Mr. Kinslow pled guilty to the conspiracy charge and the government dismissed the substantive charges.  The remaining defendants went to trial.

---

[1]There was also testimony Mr. Vandever fired a shotgun at the car; however, the jury acquitted him of all charges.

On cross-examination of Mr. Carter, the defendants discovered for the first time Mr. Carter had a nine millimeter pistol in his car the night of the incident. In addition, Mr. Carter revealed he had made a fourteen page statement which the prosecution had not provided to the defendants. The defendants moved for a mistrial based on the government's failure to comply with discovery, but the court denied the motion. Later, the defense discovered Mr. Lockhart had given a statement to the FBI. The government also failed to produce this document at the appropriate time.

During the trial, a witness testified to an unrelated incident involving James Woodlee and a woman who was "a mixture of black and white." The witness testified James Woodlee refused to go on a trip with a group of friends because this woman was also going on the trip. James Woodlee's counsel objected to this testimony as inadmissible 404(b) evidence. The court allowed the testimony with a limiting instruction.

During deliberations, the jury sent a note to the court asking for "clarification of the wording of [the indictment which described the offense as] 'to injure, threaten *and* intimidate.'" (emphasis added). This wording conflicted with the statute and the jury instructions which both described the offense in the disjunctive as, "to injure, threaten *or* intimidate." (emphasis added). In response, the court informed the jury "I have instructed you on the law, and you have your instructions."

The jury convicted Gary and James Woodlee of all three counts of violent interference with federally protected rights but acquitted them of the conspiracy charge. Mr. Vandever, the driver of the other pickup, was acquitted of all charges.

Prior to sentencing, the Woodlees filed written objections to their pre-sentence reports and filed motions for downward departure. In particular, they contested the court's use of the aggravated assault guideline and its failure to group the three counts.

At the post-trial sentencing hearing, Gary and James Woodlee testified they had no knowledge Mr. Kinslow had a gun in the vehicle or that Mr. Kinslow was going to use it. In support of this contention, Gary Woodlee offered the results of a polygraph examination he had taken. After refusing to consider the polygraph evidence, the court overruled the Woodlees' objections and denied their motions for downward departure. However, on its own motion, the court granted a two level reduction based on its desire to more closely align the Woodlees' sentences with Mr. Kinslow's and its finding that the Woodlees' conduct was "single aberrant behavior." The court sentenced the Woodlees to 78 months on each of the three counts to run concurrently. On his plea of guilty to the conspiracy charge, the court sentenced Mr. Kinslow to 70 months. This appeal followed.

**The Woodlees' Common Appeals**

1.    **Insufficiency of the Evidence**

Both Gary and James Woodlee contend the evidence is insufficient to support their convictions. A jury's verdict must be upheld if "after viewing the evidence in the light

most favorable to the prosecutor, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Jackson v. Virginia***, 443 U.S. 307, 319 (1979) (emphasis in original); ***United States v. Lane***, 883 F.2d 1484, 1495 (10th Cir. 1989).

We begin with 18 U.S.C. § 245(b) which provides:

Whoever ... by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with --
....
(2) any person because of his race, color, religion or national origin and because he is or has been --
....
(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any ... facility which serves the public...

shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results ... shall be fined under this title, or imprisoned not more than ten years, or both ....

To prove a felony conviction of this section, the government must show: (1) by use of force or threat of force; (2) the defendant willfully injured, intimidated or interfered with, or attempted to injure, intimidate or interfere with any person; (3) because of his race, color, religion or national origin; (4) because the person was, or had been, enjoying a public facility; and (5) bodily injury resulted. ***Id.***; ***Lane***, 883 F.2d at 1495; ***United States v. Makowski***, 120 F.3d 1078, 1081 (9th Cir. 1997). The only element under contention here is whether bodily injury resulted.

The Woodlees concede there is sufficient evidence to support a misdemeanor conviction based on their intent to intimidate or interfere. However, they maintain there is insufficient evidence to sustain a felony conviction which specifically requires bodily injury. The Woodlees argue, in essence, the government needed to show they *intended* to injure, not merely intended to intimidate or interfere with resulting injury. In support of their contention, the Woodlees point to the jury's note to the judge. They argue the jury's hesitancy concerning the language, "interfere, intimidate *and* injure," demonstrates the jury did not feel the Woodlees intended injury. We believe this analysis miscontrues the statute.

Section 245(b) expressly provides the government need only show the defendants' illegal conduct *resulted* in bodily injury; not that the defendants intended bodily injury. As the government maintains, the standard "is one of causation, not state of mind." This conclusion is supported by a long line of cases interpreting the phrase "if death results" under analogous statutes. *See, e.g.*, **United States v. Schwanke**, 598 F.2d 575, 579 (10th Cir. 1979) ("if death results" under 18 U.S.C. 844(i) analogized to felony murder); **United States v. Piche**, 981 F.2d 706, 711 (4th Cir. 1992) ("'if death results' requires only that death foreseeably and naturally, rather than directly and intentionally, result [sic] from the rights-violating conduct"); **United States v. Hayes**, 589 F.2d 811, 821 (5th Cir. 1979) ("No matter how you slice it, 'if death results' does not mean 'if death was intended.'");

- 9 -

***United States v. Guillette***, 547 F.2d 743, 749 (2d Cir. 1976) ("We find the principle of proximate cause embodied in [18 U.S.C.] § 241 through the phrase 'if death results.'").

According to this analysis, the bodily injury element of the felony crime is satisfied if injury was a foreseeable result of the Woodlees' intimidation or interference. In addition, the defendants need not have foreseen the actual injury that occurred; merely foreseeing some bodily injury is sufficient. ***United States v. Dixon***, 982 F.2d 116, 120 (3d Cir. 1992) ("Standard foreseeability analysis does not require [the defendant] to foresee the precise means the perpetrators he aided would use in [perpetrating the underlying offense].").

Here, the district court specifically held the defendants should have foreseen the resulting injuries. In particular, the court found:

> It is inconceivable to this Court that your awareness of the ultimate outcome in an ongoing altercation was not reasonably foreseeable. A stronger argument may have been made had you remained in the parking lot of the tavern or had you gone home when the bar was closed. Your statements in the bar, as well as Gary Woodlee's statement to [the bartender] indicating that "the s[---] was gonna come down and it ain't gonna be pretty", provide this court with a blueprint of foreseeability. I find by a preponderance of the evidence that you knew, or reasonably should have known, that the assaults and battery would occur in connection with the activity you agreed to undertake ....

This finding is not erroneous. The defendants continuously taunted three black men in a bar when everyone involved was drinking. They had a nine millimeter gun in their possession, and one of them said he would use it. When the victims left, the Woodlees chose to engage in a high speed car chase, again, while intoxicated. We

- 10 -

believe, examining this evidence in the light most favorable to the government, a rational jury could have found the government established the foreseeability of bodily injury beyond a reasonable doubt.

### 2. Sentencing Guidelines

Both Woodlees contend the district court made numerous errors during sentencing including: (1) using the sentencing guideline for aggravated assault to determine the base offense level; (2) using the shooting as relevant conduct; (3) concluding Mr. Carter suffered serious bodily injury and enhancing the sentence accordingly; (4) failing to group each count together as a single group; and (5) failing to downward depart. We review the district court's interpretation of the Sentencing Guidelines de novo, while its factual findings are reviewed for clear error. *United States v. Havens*, 910 F.2d 703, 704 (10th Cir. 1990).

At sentencing, the court correctly referenced U.S.S.G. § 2H1.1 for "Offenses Involving Individual Rights." Under this guideline, to establish the base offense level, the court must apply the greater of:

> 1. the offense level from the offense guideline applicable to any underlying offense; [or]
> 2. 12, if the offense involved two or more participants....

*U.S.S.G. § 2H1.1*.

The court applied subpart one and cross-referenced to § 2A2.2, "Aggravated Assault," as a guideline applicable to an underlying offense. The base offense level under

§ 2A2.2 is 15. Following this guideline, the court increased each count by five levels for Mr. Kinslow's discharge of a firearm. In addition, the court increased Count 2, involving Mr. Carter, by four levels for serious bodily injury, and it increased Counts 3 and 4 by two levels for bodily injury to the other two victims. The court then added three levels to each count under § 3A1.1(a) because the defendants selected the victims on the basis of their race and adjusted for multiple counts by adding three levels to the highest offense level. Finally, the court reduced two levels on its own motion because of the "aberrant nature" of the crime and to mitigate the disparity between the Woodlees' sentences and that of Mr. Kinslow. This level provided a sentencing range of 78 to 97 months for each count. The court sentenced the Woodlees to 78 months on each count to run concurrently.

### a. Aggravated Assault Guideline

The Woodlees challenge the court's decision to cross-reference to the aggravated assault guideline. Under § 2H1.1, when determining a base offense level, the court must apply the greater of 12 or the offense guideline applicable to any underlying offense. The Sentencing Guidelines define the phrase "Offense guideline applicable to any underlying offense" as "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." *U.S.S.G. § 2H1.1 note 1*. The "offense of conviction" embodies "the offense conduct charged in

- 12 -

the count of the indictment or information of which the defendant was convicted."
*U.S.S.G. § 1B1.2(a)*.

The Woodlees argue, because their conduct does not constitute the *crime* of aggravated assault under federal law or Oklahoma state law, the court incorrectly referenced the aggravated assault guideline. In support of their contention, the Woodlees note, under Oklahoma law, an aggravated assault requires "great bodily harm." *Okla. Stat. tit. 21, § 646 (1997)*. Here, it is undisputed the victims' injuries would not constitute great bodily harm under state law. Accordingly, because their conduct does not specifically fall under the Oklahoma statute entitled "Aggravated Assault," the Woodlees maintain application of the aggravated assault guideline was error.

Under the interpretation urged by the defendants, the Sentencing Guidelines' definition of aggravated assault would be wholly superfluous. In addition, the mere label a state ascribes to its crimes would govern what federal sentencing guideline a federal court is permitted to apply. We do not believe such a result is logical or necessary.

The defendants' confusion arises from the mandate of § 2H1.1 to cross-reference to a guideline "applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." This definition directs a trial court to: (1) determine the *conduct* established by the offense of conviction; (2) refer to the appropriate state and federal law to determine what offense, if any, the conduct would establish under such law; and (3) if the court determines the conduct does constitute an

offense under either state or federal law, the court must then refer to the Guidelines' Subpart concerning similar offenses. At this point, the Sentencing Guidelines' definitions aid the court in determining the appropriate guideline. Applying this interpretation to the present case, we do not believe the court erred when it cross-referenced to the aggravated assault guideline.

During sentencing, the district court made the following findings concerning the conduct established by the offense of conviction:

> You stand convicted in three (3) counts of Violent Interference with Federally Protected Activities, each count punishable by a term of imprisonment of up to ten (10) years, a Class C felony. Such charges are predicated on underlying unlawful activity resulting in injury caused by firing multiple gunshots at an occupied and moving vehicle producing the aforesaid calculated results. I find by a preponderance of the evidence that your actions constitute a felonious assault with intent to do bodily harm and that Aggravated Assault is the most analogous guideline for conduct underlying the counts of conviction.

The court clearly found the defendants committed a felonious assault with intent to do bodily harm involving a dangerous weapon. We do not believe the court erred; hence, the question becomes whether this conduct constitutes a crime under Oklahoma or federal law.

In Oklahoma, an assault is defined as "any willful and unlawful attempt or offer with force or violence to do a corporal hurt to another." *Okla. Stat. tit. 21, § 641*. The conduct, as the trial court established, clearly fits within this definition. Accordingly, the

- 14 -

conduct as established by the offense of conviction is an offense under Oklahoma law --

an assault.

An "assault" leads us to the Sentencing Guidelines' Chapter 2, Part A, Subpart 2.

This Subpart includes the Guidelines' definition of "Aggravated Assault": "a felonious

assault that involved ... a dangerous weapon with intent to do bodily harm (*i.e.*, not

merely to frighten)...." ***U.S.S.G. § 2A2.2 note 1***.  Accordingly, we are left only with the

question whether the Woodlees' conduct conforms to the Guidelines' definition of

aggravated assault.  The court's findings leave no doubt on this issue.  We perceive no

error.

### b. Relevant Conduct

The Woodlees contest the court's use of the shooting as relevant conduct in their

sentencing.  This argument tracks their argument for insufficiency of the evidence

delineated above.  In essence, they argue Mr. Kinslow's use of a firearm was not

reasonably foreseeable and there was no evidence of an agreement that a firearm would

be used; hence, Mr. Kinslow's use of a firearm is not relevant conduct.

Under the Guidelines the court may consider as relevant conduct:

(A)     all acts and omissions committed, aided, abetted, counseled,
        commanded, induced, procured, or willfully caused by the
        defendants; and
(B)     in the case of a jointly undertaken criminal activity (a criminal
        plan, scheme, endeavor, or enterprise undertaken by the
        defendant in concert with others, whether or not charged as a
        conspiracy), all reasonably foreseeable acts and omissions of

> others in furtherance of the jointly undertaken criminal
> activity,
>
> that occurred during the commission of the offense of conviction ....

**U.S.S.G. § 1B1.3(a)(1)**. "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." ***Id. at background***.

As we have already noted, the district court made specific findings concerning the Woodlees' knowledge of the firearm. In addition to these findings, the court credited the testimony of Mr. Kinslow that "he had been invited to accompany [the Woodlees] as [they] pursued [the] victims leaving the tavern." This led the court to conclude,

> Robert Kinslow committed an assault and battery upon the persons of David Carter, Timothy Walker and Brock Lockhart by firing shots from a gun into a moving car occupied by these victims. Mr. Kinslow carried out this action after being invited to accompany you and Gary Woodlee as you chased the victims from the "Stumble Inn" bar in Ft. Towson, Oklahoma. I find by a preponderance of the evidence that Kinslow's conduct was undertaken *in furtherance of a plan* to interfere with the victims' rights because of their race, and that *his actions were reasonably foreseeable by you* in connection with the criminal activity that you agreed to undertake.

(emphasis added).

The court did not err in these findings. The defendants racially taunted the victims repeatedly throughout the night. Each had possession of a nine millimeter handgun, and Gary Woodlee said he "would like to use it on them black son of a b-----s in the corner." Finally, it strains credulity that the defendants, all crowded in the front seat of the pickup,

- 16 -

did not know Mr. Kinslow had a rifle with a scope and twenty round clip.  The shooting is relevant conduct.

### c.    Serious Injury

The Woodlees received a four level serious injury enhancement for David Carter's injuries.  They argue the court erred when it applied this enhancement because the injuries in this case were not serious, and, at most, they should have received a two level enhancement for bodily injury.

The Woodlees maintain Mr. Carter's injuries were not serious because he merely received outpatient service lasting only 5-10 minutes.  In addition, they argue, while Mr. Carter is experiencing some residual effects, his vision has not dropped outside the "normal area."  The district court did not agree.

> [T]he evidence in this case has established that David Carter underwent eye surgery to remove a metal fragment from his eye, while other pellets or fragments were detected in his head and shoulder.  The evidence also shows that he has been seen or treated on several other occasions by medical professionals for the eye related injury and that such injury has caused some degree of visual impairment.  I find by a preponderance of the evidence that the injury sustained by David Carter was serious, as defined in the Sentencing Guidelines Manual and that a four (4) level increase in the offense level is warranted.
> ....
> As well, medical records admitted at trial indicated that Carter experiences floaters, in the eye, the results of which impact his vision.

Once again, the court did not err.

The Guidelines define serious bodily injury as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or

- 17 -

requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

*U.S.S.G. § 1B1.1 note j.* In contrast, "bodily injury" is defined as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." *U.S.S.G. § 1B1.1 note b*.

Here, Mr. Carter needed surgery. Although the surgery lasted only 5-10 minutes and was done on an outpatient basis, it was still surgery. There is no temporal limitation on seriousness stated or alluded to in the Guidelines. In addition, Mr. Carter has residual damage which impairs a bodily organ -- his eyes. Either circumstance supports application of the serious bodily injury increase.

### d. Grouping

The Woodlees were charged and convicted of three counts each alleging the same criminal conduct but against a different victim. They maintain the court erred when it failed to group all of the counts as a single group.

The applicable guideline provides:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> ....
> (c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

*U.S.S.G. § 3D1.2*. This provision is meant to prevent "'double counting' of offense behavior." *Id. note 5*.

The Woodlees maintain under subsection (c) the court should have grouped the three counts as one because "both the counts in the Indictment and the specific offense characteristics of § 2A2.2 allege the same conduct, i.e., discharging a firearm." In essence, they argue the indictment charged them with discharging a firearm and the same conduct was used to enhance their sentence. This argument misconstrues the guideline.

Section 3D1.2(c) mandates grouping only "[w]hen one of the *counts* embodies conduct ... applicable to another of the *counts*." Here, although the Woodlees received an enhancement for use of a firearm, discharge of a firearm was not a separate *count* against them. Under the plain language of § 3D1.2(c), grouping is not mandated.

In comparison, discharge of a firearm was a separate count in the indictment against Mr. Kinslow. Had he been convicted of all three counts *and* discharge of a firearm, then the guideline would mandate grouping. The same rationale does not apply to the Woodlees, and the court did not err.

### e.    Downward Departure

Finally, the Woodlees assert error in the court's failure to depart downward. It is well established when the district court is aware of its authority to depart but does not exercise that authority, we do not have jurisdiction to review a district court's discretionary refusal to depart downward. *United States v. Rodriguez*, 30 F.3d 1318, 1319 (10th Cir. 1994). The claim is without merit.

### B.    James Woodlee

- 19 -

## 1.       404(b) Testimony

During its case in chief, the government elicited testimony from a friend of James Woodlee regarding Mr. Woodlee's racist attitudes.  Mr. Woodlee maintains the court's admission of the testimony is contrary to Fed. R. Evid. 404(b) and constitutes reversible error.  We review the district court's evidentiary decisions for an abuse of discretion. ***United States v. Segien***, 114 F.3d 1014, 1022 (10th Cir. 1997).

> Rule 404(b) provides:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....

Evidence of other crimes, wrongs or acts is admissible under this rule if:

> 1) the evidence is offered for a proper purpose; 2) the evidence is relevant; 3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and 4) upon request, the trial court instructs the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

***United States v. Herndon***, 982 F.2d 1411, 1414 (10th Cir. 1992) (citing ***Huddleston v. United States***, 485 U.S. 681, 691-92 (1988)).

Here, the government elicited testimony from Terry Gibson recounting a conversation between himself and James Woodlee that took place approximately one week before the shooting.  Mr. Gibson testified James Woodlee planned to accompany some friends on an outing but, when Mr. Woodlee learned a woman of "mixed race"

would also attend, he refused to go. Mr. Woodlee's counsel objected to the testimony and moved for a mistrial. Later, during a conference on jury instructions, counsel again moved for a mistrial. Finding the evidence relevant to show racial motive and intent, the court denied both motions choosing instead to instruct the jury:

> Evidence concerning offenses, wrongs or acts other than the offenses charged in the indictment has been admitted against the defendants for the limited purpose of establishing motive, opportunity or intent as to the defendants. You will consider that evidence only for those purposes.

Mr. Woodlee argues the court erred by finding the evidence was offered for a proper purpose. In addition, he maintains any probative value was outweighed by the potential for unfair prejudice. We do not find either argument persuasive.

To establish a felony conviction under 18 U.S.C. § 245(b)(2)(F), the government was required to prove Mr. Woodlee acted because of the victims' "race, color, religion or national origin." Evidence of past racial animosity is relevant to establish this element of the offense. Accordingly, it falls squarely within the motive and intent purposes delineated in 404(b).

In a similar case, **United States v. Franklin**, 704 F.2d 1183 (10th Cir. 1983), we held the court's admission of evidence of a prior racially motivated act was not error. In **Franklin**, the defendant murdered two black men while they jogged in a public park. He was charged with and convicted of two counts of violating § 245(b)(2). At his trial, the prosecution sought to introduce evidence of the defendant's assault on an interracial couple four years earlier. We affirmed the district court's admission of the evidence.

> Intent is an element of the offense Franklin was charged with. The statute proscribes willfully injuring "any person *because* of his race." 18 U.S.C. § 245(b) (emphasis added). Thus the Government was required to prove not only that Franklin killed Fields and Martin but that he did so because of their race.

*Id.* at 1188; *see also United States v. Dunnaway*, 88 F.3d 617, 619 (8th Cir. 1996) ("Because [defendant] was charged with a racially motivated crime, [§ 245(b)(2)(B),] evidence of his racist views, behavior, and speech were [sic] relevant and admissible to show discriminatory purpose and intent, an element of the charges against him.").

In this case, Mr. Woodlee is charged under the same general statute as the defendants in *Franklin* and *Dunnaway*, and the government bears the same burden. Mr. Woodlee does not, and indeed cannot, distinguish these cases. The evidence was admitted for a proper purpose.

Mr. Woodlee's contention that the probative value of the evidence was outweighed by its prejudicial tendencies is also without merit. A trial court has broad discretion to determine whether, under Fed. R. Evid. 403, the probative value of evidence is substantially outweighed by the risk of unfair prejudice. *See Franklin*, 704 F.2d at 1187.

In this case, the challenged evidence merely depicted Mr. Woodlee's refusal to attend an outing with friends; the evidence did not describe a prior crime. In addition, there was ample direct evidence of Mr. Woodlee's racial attitudes through direct testimony recounting his taunting on the night of the incident. We do not believe the court abused its discretion when it admitted the evidence.

- 22 -

## 2. Brady

James Woodlee maintains the government's failure to reveal the victims had a gun constitutes reversible error under *Brady v. Maryland*, 373 U.S. 83 (1963). "To establish a *Brady* violation, the defendant must establish: 1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material." *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994). We review allegations of *Brady* violations de novo. *Hughes*, 33 F.3d at 1251.

During cross-examination of the government's first witness, David Carter, the defense elicited testimony he had a nine millimeter pistol in his car the night of the shooting. Mr. Carter testified he never removed the pistol from his car prior to the shooting, never used the weapon, and the evidence showed none of the defendants knew he had the pistol. Upon discovering the information, Mr. Woodlee moved for a mistrial. The court denied the motion, and Mr. Woodlee asserts error. We can find none.

Defendant's burden here is to show the "evidence was favorable to the accused." *Id.* However, Mr. Woodlee fails to make clear just how Mr. Carter's possession of a weapon is "favorable" to his defense. He asserts "[t]he evidence is clearly favorable to the accused in that the alleged victims had access to the gun throughout the evening for their protection." However, in the absence of evidence indicating the defendants were aware of this fact, that argument is sophistry. At most, the evidence demonstrates Mr. Carter was scared and intimidated by the defendants and felt the need to protect himself.

Thus, if anything, the evidence tends to prove an element of the government's case, intimidation, rather than aid the defense.

In any case, even if the evidence were exculpatory, we believe it is immaterial. Evidence is material under **Brady** when, had the evidence been disclosed, there is a reasonable probability of a different result at trial. **Kyles v. Whitley**, 514 U.S. 419, 433-34 (1995). A reasonable probability of a different result is "shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." **Id.** at 434 (citations and quotations omitted). When **Brady** evidence is made available during the course of a trial, "the materiality inquiry focuses on whether earlier disclosure would have created a reasonable doubt of guilt." **United States v. Young**, 45 F.3d 1405, 1408 (10th Cir. 1995).

Here, the evidence was divulged with the first witness at trial, and each defendant had the opportunity to cross-examine every witness about the gun. If any defendant felt prejudiced, he could have sought a continuance; none did. Finally, on this record, we do not believe earlier disclosure would have created a reasonable doubt whether James Woodlee intimidated, interfered, or injured these victims. There is ample direct evidence of his guilt, the jury knew about the gun with the first witness, and the defense had a full opportunity to exploit the belatedly disclosed evidence. *See, e.g.*, **United States v. Rogers**, 960 F.2d 1501, 1510 (10th Cir. 1992) ("The **Brady** rule is not violated when the material requested is made available during trial."); **Young**, 45 F.3d at 1409 ("When the

- 24 -

abundance of evidence is combined with the fact that counsel was able to cross-examine [declarant] in rebuttal and the jury was able to hear and weigh the [evidence], we see no basis for concluding that the outcome of the trial could have been different if the [evidence] had been disclosed earlier.").  We perceive no error.

### 3.	The *Jencks Act*

Under the *Jencks Act*:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

*18 U.S.C. § 3500(b)*.  Violations of the *Jencks Act* are subject to harmless error analysis. *Young*, 45 F.3d at 1409.

During the cross-examination of the first witness, David Carter, defendants also learned for the first time Mr. Carter had made a fourteen page statement.  The government asserted it did not know about the statement until the moment the defense uncovered its existence.  In addition, during the cross-examination of Brock Lockhart, the third witness, defendants discovered he had made an undisclosed statement to the FBI. The government supplied both documents during Mr. Lockhart's cross-examination.

James Woodlee moved for a mistrial based on the *Jencks Act* violations.  The court denied the motion but did make efforts to correct the error, offering defendants additional time to review the materials and the opportunity to recall any witnesses.  James

Woodlee accepted the court's offer of additional time, and the court granted a recess. Upon reconvening, the court explained to the jury the delay was "occasioned by the fact that the Government failed to turn over some things to the defendants they were supposed to." The defendants proceeded to cross-examine Mr. Lockhart concerning his and Mr. Carter's statements; however, no one attempted to recall Mr. Carter. At the close of the government's case, Gary Woodlee proposed admitting Mr. Carter's statement by stipulation to avoid a recall. The government agreed, and James Woodlee did not object.

The government violated the letter of the *Jencks Act* when it failed to disclose the two statements. However, because the defendant had the opportunity to immediately cross-examine Mr. Lockhart on his statement and, in fact, did so, we believe any error concerning his statement was harmless. *See, e.g.*, **Young**, 45 F.3d at 1409 ("In light of appellant's subsequent opportunity to cross-examine [declarant] about the statements, however, we must find that any error in this regard was harmless.").

Although Mr. Carter's statement presents a closer question, we do not believe James Woodlee can prevail. Mr. Woodlee had the opportunity to recall Mr. Carter and chose not to do so. In addition, he did not object to the admission of the statement by stipulation. Finally, Mr. Woodlee does not specifically identify any alleged prejudice suffered as a result of the violation, stating only "[t]he government's failure to provide the statements was prejudicial to the defendants as they provided inconsistencies and

omissions from the witnesses' testimony."  Under these circumstances, we conclude the government's failure to disclose the statement, while not laudable, was harmless.

### C.    Gary Woodlee

**1.    Polygraph**

At his sentencing, Gary Woodlee offered the results of a polygraph to corroborate his testimony he did not know Mr. Kinslow had a rifle or intended to use a rifle.  The court refused to consider the polygraph evidence finding it to be wholly unreliable and irrelevant.

Because of the circumstances of this case, we need not consider whether the polygraph evidence should have been admitted.  Assuming error only for the sake of argument, however, we believe any error is harmless.  *See **Williams v. United States***, 503 U.S. 193, 203 (1992) (applying harmless error analysis to court's reliance on an invalid factor during sentencing).

Gary Woodlee's proffered polygraph evidence focused only upon whether he *saw* Mr. Kinslow's rifle.[2]  However, the critical issues for purposes of Mr. Woodlee's sentencing were: (1) whether he intended an injury; and (2) whether Mr. Kinslow's use of a firearm was foreseeable.  The fact that Mr. Woodlee never *saw* the rifle is not

---

[2]The polygraph record states:
33.    On June 23, 1994, did you see a rifle before shots were fired by "Kinslow"?
Subject Answered: "No".
35.    On June 23, 1994, did you see a rifle when "Kinslow" got into your truck?
Subject Answered: "No".

dispositive of these issues.  Failure to see the rifle does not negate an intent to injure or negate foreseeability.  Mr. Woodlee could have known Mr. Kinslow retrieved the gun from his car without actually seeing it.  Accordingly, assuming the court's failure to receive the evidence was error, the "error did not affect the district court's selection of the sentence imposed"; hence, it was harmless.  *Id.*

### D.    Mr. Kinslow

#### 1.    Hate Crime

Mr. Kinslow pled guilty to conspiracy to violate federal rights.  His sentence of 70 months includes a three level enhancement for hate crime motivation.  Mr. Kinslow only appeals the court's application of this enhancement, arguing: 1) the court did not apply the correct legal standard; and 2) the evidence does not support use of the enhancement.

The guideline in question, U.S.S.G. § 3A1.1(a), provides for a three level enhancement when the court "determines beyond a reasonable doubt that the defendant intentionally selected any victim ... as the object of the offense because of the actual or perceived race ... of any person."  Mr. Kinslow maintains the court incorrectly applied a preponderance standard instead of the required reasonable doubt standard.  In support of this contention, he notes § 3A1.1(b), directly below the operative section, only requires a preponderance standard.[3]

---

[3]Section 3A1.1(b) provides: "If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by
(continued...)

The court made these findings and conclusions during the sentencing:

You, Mr. Kinslow, were recruited to accompany the Woodlees as they continued to interfere with the rights of others, and did so armed with a rifle. You aided or contributed to this criminal objective by shooting at the persons of Carter, Walker and Lockhart, gunfire that caused personal injury.

....

It is reasonable to infer from the facts and circumstances of this case that you knew, or reasonably should have known, that [the] victims targeted in this instance were black and that the actions taken against them were racially motivated. Therefore, the Court finds beyond a reasonable doubt that the victims of the instant offense were initially selected because of their actual or perceived race and that a three (3) level increase in the offense level is warranted.

While this finding does not mirror the language of the guideline, we believe it sufficiently states the court's position. Clearly, the court found the victims were chosen because of their race and Mr. Kinslow knew this fact. By aiding and abetting the continuing crime, Mr. Kinslow must have also made the same choice. This conclusion is supported by the fact Mr. Kinslow pled guilty to an indictment charging him with racial discrimination. Count 1 of the indictment reads:

[Defendants did] willfully, and knowingly conspire ... to injure, threaten and intimidate [the victims] in the free exercise and enjoyment of a right secured to them by the Constitution and laws of the United States, that is, the right to full and equal enjoyment of the goods, services and facilities of a place of public accommodation and entertainment ... *without discrimination on account of race or color*.

(emphasis added). Mr. Kinslow's guilty plea thus necessarily includes an admission that he agreed to interfere with the victims because of their race. In addition, each of the

---

[3](...continued)
2 levels."

substantive crimes underlying the conspiracy required a showing of racial motivation. The court did not err.

Finally, Mr. Kinslow argues, even if the court applied the correct standard, the facts do not support use of the enhancement because he did not "select" any victim. The record reflects that, while in the bar, Mr. Kinslow did not participate in any of the racial taunting. Instead, he sat at the opposite side of the bar from the other defendants and consumed beer. When the bartender closed the bar, Mr. Kinslow walked to his car in the parking lot. As he got into his car, Gary Woodlee pulled up in his truck and "directed Mr. Kinslow to get into their truck." Mr. Kinslow grabbed his gun and joined the Woodlees. This evidence, maintains Mr. Kinslow, demonstrates he "played no role in the selection of the victims but joined the offense only toward the conclusion of a crime already in progress."

We, like the district court, believe this argument strains the obvious. It is inconceivable Mr. Kinslow did not "select" his victims because of their race. Mr. Kinslow sat in a bar where three black men were racially taunted throughout the night. The three men did not retaliate in any fashion. The only logical reason to chase and shoot at these men was their race. We do not believe simply because the other defendants made the initial decision whom to taunt Mr. Kinslow is relieved of his choice to join in the melee. The facts demonstrate he chose to point and fire a rifle at a car with three people in it because of the color of their skin. Mr. Kinslow offers no alternative reason for his

choice to shoot into that car. The court's application of the hate crime enhancement is supported by the record and is not error.

The judgments of the district court are **AFFIRMED**.