FILED
United States Court of Appeals
Tenth Circuit

March 4, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JERRY LEE BURKHOLDER,

Defendant-Appellant.

No. 13-8094

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 1:13-CR-00069-SWS-1)**

O. Dean Sanderford, Assistant Federal Public Defender, Denver, Colorado
(Virginia L. Grady, Interim Federal Public Defender, with him on the briefs), for
Defendant-Appellant.

Eric J. Heimann, Assistant United States Attorney, Cheyenne, Wyoming
(Christopher A. Crofts, United States Attorney, with him on the brief), for
Plaintiff-Appellee.

Before **BRISCOE**, **HOLMES**, and **BACHARACH**, Circuit Judges.

**HOLMES**, Circuit Judge.

Jerry Lee Burkholder was charged with distributing a controlled substance,

the use of which resulted in the death of Kyle Dollar, in violation of 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(E).  The latter provision imposes a fifteen-year

statutory maximum sentence "if death . . . results from the use" of certain controlled substances. *See* 21 U.S.C. § 841(b)(1)(E)(i). The district court declined to instruct the jury that, under § 841(b)(1)(E), the government was required to prove that Mr. Dollar's death was a reasonably foreseeable result of the charged drug distribution. Mr. Burkholder was subsequently convicted. He now asks us to vacate his conviction and remand for a new trial, arguing that the statute requires proof that the substance he distributed proximately caused Mr. Dollar's death. Exercising jurisdiction under 28 U.S.C. § 1291, we reject this argument and **affirm** the district court's judgment.

## I

On the evening of November 8, 2012, Kyle Dollar (the decedent) spent several hours drinking alcoholic beverages with friends at a residence in Rock Springs, Wyoming. Later that evening, the group traveled to the Astro Lounge club. Sometime after midnight, Mr. Dollar wandered away from his friends at the club to talk to other people. When he rejoined the group, Mr. Dollar told them that he was leaving; his brother came to the club to pick him up and took Mr. Dollar home. Later that night, Mr. Dollar returned to the Rock Springs address where earlier he had been drinking; he remarked that he "felt great," and socialized before falling asleep. R., Vol. III, at 355–56 (Trial Tr., dated Sept. 24, 2013). The next morning, Mr. Dollar's friends found him unresponsive and without a pulse; he was dead.

2

Local law-enforcement officers found no blood, vomit, or obvious injuries on Mr. Dollar, and no drugs or drug paraphernalia. But they did review the text messages in Mr. Dollar's cell phone; they revealed an exchange of messages between Mr. Dollar and Mr. Burkholder (the defendant) between 2:30 a.m. and 4:30 a.m. on November 9. These messages, as well as subsequent interviews, led the officers to search Mr. Burkholder's residence. They seized there a Crown Royal bag containing Suboxone tablets and Suboxone wrappers.

Suboxone is a prescription drug. An active ingredient in it is buprenorphine, a Schedule III controlled substance, which is an opioid commonly prescribed for treating heroin addicts. Mr. Burkholder, a recovering addict, had been prescribed Suboxone as part of his treatment plan. At the time he was prescribed the drug, Mr. Burkholder signed a treatment agreement with his doctor in which he "agree[d] not to sell, share or give any [buprenorphine] to another person." *Id.* at 531–32 (Trial Tr., dated Sept. 25, 2013). The agreement further evinced his understanding that "mixing buprenorphine with other medications . . . and/or other drugs of abuse, including alcohol, can be dangerous." *Id.* at 532. Nevertheless, Mr. Burkholder admitted to the police that he had given Mr. Dollar a Suboxone tablet in the Astro Lounge's restroom while Mr. Dollar was there the night of November 8.

Mr. Burkholder was subsequently placed under arrest and indicted by a federal grand jury on one count of "knowingly, intentionally, and unlawfully

3

distribut[ing] buprenorphine, a Schedule III controlled substance, the use of which resulted in the death of Kyle Dollar," in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(E). R., Vol. I, at 13 (Indictment, filed Mar. 21, 2013). At Mr. Burkholder's trial, the government presented two expert witnesses: Dr. James Wilkerson, the medical examiner who performed the autopsy on Mr. Dollar, and Dr. Robert Palmer, a forensic toxicologist. Both experts opined that Mr. Dollar's death was the result of his consumption of a combination of buprenorphine and alcohol. Dr. Wilkerson, for example, described how Mr. Dollar's lungs showed signs of a pulmonary edema, or fluid in the lungs, which is a hallmark of death by opioid overdose.[1] Furthermore, according to Dr. Palmer, the testimony of Mr. Dollar's friends completed the picture: "initially feeling pretty good and then maybe feeling a little sick . . . then getting sleepier; then as the airways relax, . . . . breathing against increased resistance" were all "consistent with opioid-related intoxication." R., Vol. III, at 322.

Mr. Burkholder's own expert—a toxicologist, Robert Lantz—agreed that Mr. Dollar had ingested buprenorphine and was "metabolizing some of it" prior to his death, *id.* at 585–86, but viewed Dr. Wilkerson's conclusion that buprenorphine was the cause of Mr. Burkholder's death to be unsupported. According to Dr. Lantz, buprenorphine has a "ceiling effect" and does not depress

---

[1]     Dr. Wilkerson explained to the jury that opioids impede respiration; they "tell[ ] your brain to stop giving you the impulse to breathe, and you stop breathing and your heart rate stops." R., Vol. III, at 256.

4

a person's respiration beyond a certain point. *Id.* at 560–61. Instead, he believed it was more likely that Mr. Dollar had died from overdosing on a "synthetic" drug, which general drug-screening procedures would not have detected. *Id.* at 561. Further, Dr. Marvin Couch, who prescribed Mr. Burkholder the Suboxone, testified that he would not have anticipated that death would result from the low dosage Mr. Dollar apparently consumed.

At the jury-instruction conference, Mr. Burkholder asked the court to instruct the jury that, in order to convict him under § 841(b)(1)(E)(i), it was obliged to find that Mr. Dollar's death was a reasonably foreseeable result of the distribution of Suboxone.[2] However, the district court declined, concluding instead that the statute did "not impose a 'reasonable foreseeability' requirement," and that "but for" causation was all that was required. R., Vol. III, at 613. As such, the court rejected the inclusion of any "proximate cause" or "foreseeability" element in the jury instructions. It instructed the jury as follows regarding the crime of death resulting from drug distribution:

> Before you may find the Defendant guilty of the offense charged in the indictment, you must find by proof beyond a reasonable doubt that Kyle Dollar's death resulted from the use of the buprenorphine distributed by the Defendant.

---

[2] It appears that Mr. Burkholder did not file a set of proposed jury instructions. At the jury-instruction conference, his counsel indicated that he had "been *trying to* draft . . . 'proximate cause' and 'foreseeable' instructions for . . . about a couple [of] weeks." R., Vol. III, at 612 (emphasis added).

5

> This standard is satisfied upon a finding by you that, *but for* Kyle Dollar ingesting the buprenorphine distributed by the Defendant, Kyle Dollar would not have died.

R., Vol. I, at 111 (Jury Instrs., filed Sept. 26, 2013) (emphasis added). After receiving the court's instructions, including this one—and considering the evidence—the jury found Mr. Burkholder guilty. Mr. Burkholder timely appealed from the district court's judgment.[3]

## II

The sole issue Mr. Burkholder raises on appeal is whether the district court erred in declining to instruct the jury that, in order to convict him under 21 U.S.C. § 841(b)(1)(E), it was required to find that Mr. Dollar's death was a reasonably

---

[3]    As computed by the United States Probation Office, the United States Sentencing Guidelines Manual (2012 edition) prescribed an advisory sentence range for Mr. Burkholder of seventy to eighty-seven months' imprisonment. By its plain terms, because he was convicted of the death-resulting offense under 21 U.S.C. § 841(b)(1)(E)(i), the Guidelines assigned Mr. Burkholder to a higher base offense level—i.e., twenty-six—than would otherwise have been applicable. *See* U.S.S.G. § 2D1.1(a)(4). Specifically, if the death-resulting provision had not been implicated, Mr. Burkholder's base offense level probably would have been six, but no higher than twenty. *See* U.S.S.G. § 2D1.1(a)(5) (absent the death-resulting enhancement, referencing the drug table of subsection (c)). *Compare* U.S.S.G. § 2D1.1(c)(17) (assigning, as relevant here, a base offense level of six to violations of 21 U.S.C. § 841 involving "[l]ess than 250 units of Schedule III substances"), *with id.* § 2D1.1(c)(10) (providing for, as relevant here, a base offense level of twenty to violations of 21 U.S.C. § 841 involving "40,000 or more units of Schedule III substances"). The district court sentenced him to a within-Guidelines sentence of seventy-eight months in prison and three years of supervised release. Mr. Burkholder does not challenge the reasonableness of his specific sentence on appeal. Moreover, he does not dispute the general validity of the statutory maximum penalty of fifteen years established by 21 U.S.C. § 841(b)(1)(E)(i) for Schedule III drug distributions resulting in death. Accordingly, we have no occasion to address these matters here.

foreseeable consequence of Mr. Burkholder's distribution of buprenorphine. Resolution of this issue turns on a question of statutory interpretation: Does 21 U.S.C. § 841(b)(1)(E)—which establishes a statutory-maximum sentence of fifteen years' imprisonment for the distribution of a Schedule III controlled substance if "death . . . results from the use of" that substance—require proof of proximate causation?[4]

To the extent that Mr. Burkholder challenges "the district court's instruction because the court allegedly failed to accurately give the jury the correct law"—and to the extent that determining the "correct law" requires us to engage in statutory interpretation—our review is de novo. *United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014); *accord United States v. Sturm*, 672 F.3d 891, 897 (10th Cir. 2012) (en banc); *see also United States v. Nacchio*, 573 F.3d 1062, 1087 (10th Cir. 2009) ("We review questions of statutory interpretation de novo.").

## A

### 1

At the outset, we provide a brief overview of the structure of 21 U.S.C. § 841 to help clarify the nature of our interpretive inquiry. Section 841(a)(1)

---

[4]     We were previously asked to decide this question in *United States v. MacKay*, 715 F.3d 807 (10th Cir. 2013); however, "because of the posture of [that] case, we d[id] not opine on whether § 841(b)'s language contain[ed] a foreseeability or proximate cause requirement." 715 F.3d at 825.

makes it unlawful, *inter alia*, to knowingly or intentionally "distribute . . . a controlled substance." Section 841(b) provides the penalties for that unlawful act. As relevant here, subsection (1)(E)(i) of § 841(b) says that

> in the case of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 10 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not more than 15 years.

21 U.S.C. § 841(b)(1)(E)(i). As these plain terms reveal, the death-results-from provision operates in the statute to enhance the maximum penalty for the knowing or intentional distribution of a Schedule III controlled substance to fifteen years. If the provision is not triggered, the statutory-maximum penalty for such an offense is ten years. Though it does not specify the *actus reus* for the offense (i.e., distribution of a controlled substance) or the offense's *mens rea* (i.e., knowing or intentional), it is now well-settled that such a penalty-enhancement provision must be charged in the indictment and proved by the government beyond a reasonable doubt because it has the effect of increasing the statutory maximum penalty. *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

It is undisputed here that the inquiry into whether death "results from the use" of the distributed controlled substance is, at bottom, one of causation (i.e.,

8

Was the death caused by the use?).[5]  Mr. Burkholder contends that the death-

---

[5]       Relying on the principle that strict-liability criminal offenses are "generally disfavored," the Dissent mistakenly casts our holding today as stripping away § 841's *mens rea* requirement.  Dissent at 5 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978)).  *Mens rea* is unquestionably the central concern of the strict-liability concept in the criminal context.  *See, e.g.*, *Strict-liability Crime*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("An offense for which the action alone is enough to warrant a conviction, with no need to prove a mental state . . . .").  However, we have never suggested that our analysis relates to *mens rea*—the proper focus here is on causation.  Indeed, in grappling with a similar matter in *United States v. Woodlee*, we squarely rejected defendants' misguided framing of the question in terms of intent (i.e., *mens rea*), noting that the relevant standard is "one of causation, *not state of mind*."  136 F.3d 1399, 1405 (10th Cir. 1998) (emphasis added).

In this regard, as we have noted, the crime charged in Mr. Burkholder's indictment alleged a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(E)(i).  The Supreme Court has stated that this crime "has two principal elements: (i) knowing or intentional distribution [of a controlled substance], § 841(a)(1), and (ii) death caused by ('resulting from') the use of that drug, [§ 841(b)]."  *Burrage v. United States*, --- U.S. ----, 134 S. Ct. 881, 887 (2014).  It is beyond peradventure that "'[r]esults from' imposes . . . a requirement of actual *causality*."  *Id*. (emphasis added).  Significantly, the Supreme Court did not indicate that a separate *mens rea* requirement attaches to the second element of this crime.  *Cf. Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009) (holding that "[a] federal criminal statute forbidding aggravated identity theft" that enhances the criminal penalty when "the offender *knowingly* transfers, possesses, or uses, without lawful authority, *a means of identification of another person* . . . . requires the Government to show that the defendant *knew* that the means of identification he or she unlawfully transferred, possessed, or used, in fact, belonged to another person." (quoting 18 U.S.C. § 1028A(a)(1) (internal quotation marks omitted))).  This reinforces the point that the question here is one of causation—not *mens rea*.

We recognize that the Dissent is not alone in this confusion.  Indeed, in addressing identical language in 21 U.S.C. § 841(b)(1)(C), some of our sibling circuits have made linguistic references that bespeak *mens rea*.  *See United States v. Hatfield*, 591 F.3d 945, 950 (7th Cir. 2010) (expressing "misgivings about interpreting 'results from' in the statute to impose strict liability"); *see also United States v. Rebmann*, 226 F.3d 521, 522, 525 (6th Cir. 2000) ("On its face,

(continued...)

9

results-from provision requires that the use of the controlled substance be more than the "but-for cause" or "cause in fact" of the death—that is, it must be more than simply "[t]he cause without which the event could not have occurred." *But-for Cause*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see, e.g.*, *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) ("An act is a but-for cause of an event if the act is a *sine qua non* of the event—if, in other words, the absence of the act would result in the non-occurrence of the event."); Wayne R. LaFave, *Substantive Criminal Law* § 6.4 (2d ed. database updated Oct. 2015) ("In order that conduct be the actual cause of a particular result, it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that 'but for' the antecedent conduct the result would not have occurred.").

In Mr. Burkholder's view, § 841(b)(1)(E)(i) demands that the use be the "proximate cause" or "legal cause" of the death—meaning that the cause must be "legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor." *Proximate Cause*, BLACK'S LAW DICTIONARY (10th ed. 2014). As Justice O'Connor has noted "proximate cause principles inject a foreseeability element into [a] statute." *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Oregon*,

---

[5](...continued)
the statute [i.e., 21 U.S.C. § 841] is, in effect, a strict liability statute with respect to the injury or death of another arising out of the distribution of drugs."). However, as the Supreme Court has indicated in *Burrage*, the question before us is one of causation.

515 U.S. 687, 713 (1995) (O'Connor, J., concurring); *see United States v. Hargrove*, 714 F.3d 371, 374 (6th Cir. 2013) ("To be proximately caused, the harm must be reasonably foreseeable."); *United States v. Hatfield*, 591 F.3d 945, 949 (7th Cir. 2010) (noting that "'proximate cause' usually implies foreseeability"); *United States v. Hanousek*, 176 F.3d 1116, 1123 (9th Cir. 1999) ("To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct."); *Henry v. Merck & Co.*, 877 F.2d 1489, 1495 (10th Cir. 1989) (noting that "foreseeability is the standard by which proximate cause . . . is to be tested"); *see also In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring) (where "the harm must 'proximately' result from the crime," examining the record to discern whether defendant's "crime was a reasonably foreseeable result of the illegal [conduct]"); *cf. United States v. Apollo Energies, Inc.*, 611 F.3d 679, 690 n.5 (10th Cir. 2010) ("We emphasize that 'foreseeability' in the proximate cause sense is not foreseeability of a legal rule.").

## 2

"As with all statutory interpretation cases, we begin with the language of the statute." *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1136 (10th Cir. 2011). The plainness of statutory language "is determined by reference to the language itself, the specific context in which that language is used, and the broader context

of the statute as a whole." *Id.* at 1137 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

In that regard, Congress's specific choice of the words in § 841(b)(1)(E)(i) —that is, "death . . . *results from* the use of such substance"—is noteworthy. To begin with the obvious, Congress decided to use "results from" instead of "causes." As we have stated, in a different context, "[r]esulting in death and causing death are not equivalents." *United States v Cardena-Garcia*, 362 F.3d 663, 666 (10th Cir. 2004). In *Cardena-Garcia*, we addressed a provision of the United States Sentencing Guidelines Manual ("U.S.S.G" or "Guidelines") relating to the offense of transporting or harboring unlawful aliens "resulting in the death of any person." *See* 8 U.S.C. § 1324(a). We concluded that the specific Guidelines provision did not establish a proximate-cause requirement "and we ha[d] no license to impose one"; "if a death resulted from the transportation, [the] enhancement [wa]s required." *Cardena-Garcia*, 362 F.3d at 665–66. Generally, then, "the ordinary meaning of 'result[s] from' imposes a requirement of actual or but-for causation," and not proximate causation. *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014), *cert. denied*, --- U.S. ----, 135 S. Ct. 771 (2014).

Further, the use of the passive voice evinces a concern with "whether something happened—not how or why it happened." *Dean v. United States*, 556 U.S. 568, 572 (2009); *see Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1206 (10th

12

Cir. 2003) ("The [Fourth] Amendment is expressed in passive voice . . . . The focus of the Amendment is thus on the security of the person, not the identity of the searcher or the purpose of the search."); *see also E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128 (1977) ("The question of the form of § 301 limitations is tied to the question whether the Act requires the Administrator or the permit issuer to establish the limitations. Section 301 does not itself answer this question, for it speaks only in the passive voice of *the achievement and establishment of the limitations*." (emphasis added)); *cf. Jones v. United States*, 526 U.S. 227, 258 (1999) ("[T]here is some significance in the use of the active voice in the main paragraph and the passive voice in clauses (2) and (3) of § 2119. In the more common practice, criminal statutes use the active voice to define prohibited *conduct*." (emphasis added)). In this vein, interpreting identical language in another clause of § 841(b), the Ninth Circuit concluded that the use of "passive language unambiguously eliminates any statutory requirement that the death have been foreseeable. According to its language, as long as death 'results' from the use of a described controlled substance," the defendant faces the statutorily-mandated sentence. *United States v. Houston*, 406 F.3d 1121, 1124 (9th Cir. 2005). Thus, the causal language that Congress employed itself strongly suggests that § 841(b)(1)(E)(i) requires only but-for causation.

Broadening our analytical lens only bolsters this conclusion.[6]  Even a

---

[6]      The Dissent contends that our decision to employ a broad analytical lens to further support our interpretation of the statutory language is at odds with an interpretation "tethered to the 'plain language.'"  Dissent at 7.  However, we must disagree with our thoughtful colleague in dissent.  In particular, we respectfully submit that the Dissent's objection is misguided.  "[I]t is a fundamental canon of statutory construction that the words of a statute must be read in their *context* and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (emphasis added); *accord First Nat'l Bank of Durango v. Woods* (*In re Woods* ), 743 F.3d 689, 694 (10th Cir. 2014); *see also Deal v. United States*, 508 U.S. 129, 132 (1993) (It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").  Indeed, "[w]e begin our analysis by examining the subsection's structure, as '*the meaning of statutory language, plain or not, depends on context*.'"  *In re Woods*, 743 F.3d at 694 (emphasis added) (quoting *United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009)); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012) ("This critical word *context* embraces not just textual purpose but also (1) a word's historical associations acquired from recurrent patterns of past usage, and (2) a word's immediate syntactic setting—that is, the words that surround it in a specific utterance.").

Contrary to the Dissent's view that "only ambiguity" compels us to look to statutory context, Dissent at 8, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson*, 519 U.S. at 341; *accord Util. Air Regulatory Grp. v. E.P.A.*, --- U.S. ----, 134 S. Ct. 2427, 2442 (2014); *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011); *David v. Sirius Computer Solutions, Inc.*, 779 F.3d 1209, 1211 (10th Cir. 2015).  Furthermore, because we are narrowly focused on the statutory language and its context, we believe that our inquiry is more apt to properly discern Congress's intent than the Dissent's, which relies on largely extratextual sources.  *See* Scalia & Garner, *supra*, at 3 ("In an age when democratically prescribed texts (such as statutes, ordinances and regulations) are the rule, the judge's principal function is to give those texts their fair meaning"); *id.* at 33 ("This critical word *context* embraces not just textual purpose but also (1) a word's historical associations acquired from recurrent patterns of past usage, and (2) a word's immediate syntactic setting—that is, the words that surround it in a specific utterance.").

14

cursory survey of federal criminal statutes reveals numerous instances in which Congress explicitly included proximate-cause language in statutory penalty enhancements. *See, e.g.*, 18 U.S.C. § 38(b)(3) (stating, in relation to fraud involving aircraft or space vehicle parts, that a twenty-year maximum sentence may be imposed where "the part . . . is the *proximate cause* of a malfunction . . . that results in the death" (emphasis added)); *id.* § 844 (authorizing the imposition of the death penalty "if death results to any person, . . . *as a direct or proximate result* of conduct prohibited by this subsection" (emphasis added)). *Compare* 18 U.S.C. § 247(d)(2) ("[I]f bodily injury results to any person . . . as a *direct or proximate result* of conduct prohibited by this section, . . . imprisonment for not more that 40 years" is permitted. (emphasis added)), *with id.* § 247(d)(1) ("[I]f death *results from* acts committed in violation of this section . . . imprisonment for any term of years or for life," or a death sentence is authorized. (emphasis added)). This evinces that Congress clearly knew how to add a proximate-cause requirement in criminal penalty-enhancement statutes when it wished to do so. That it nevertheless did not do so in § 841(b)(1)(E) is thus very telling; indeed, it suggests that Congress intended to omit a proximate-cause requirement from § 841(b)(1)(E). *See, e.g.*, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *United States v. Holmes*, 727 F.3d 1230, 1244 (10th Cir. 2013) ("Congress knew how to draft a period of

15

limitations . . . . That Congress chose not to . . . does not appear accidental, and we must honor Congress's choice."); *Hackwell v. United States*, 491 F.3d 1229, 1235–36 (10th Cir. 2007) (noting that "the distinction in meaning between compensation for 'services rendered' and 'expenses' is further exemplified by several federal statutes," and concluding that "[t]he [statute's] text and Congress's consistent, repeated distinction between 'services rendered' and 'expenses' demonstrates Congress's intent to exclude expenses from the attorney-fee limitation").

Furthermore, the omission of such proximate-cause language is especially suggestive of Congress's intent *not* to require proximate causation in § 841(b)(1)(E)(i) because Congress included the language at issue here—*viz.*, "death . . . results from the use"—in 2008, *after* our sister circuits uniformly had held that identical language in § 841(b)(1)(C) lacked a proximate-cause element.[7] *See Houston*, 406 F.3d at 1124 ("The plain language of § 841(b)(1)(C) demonstrates that proximate cause is not a required element."); *United States v. McIntosh*, 236 F.3d 968, 972 (8th Cir. 2001) ("We hold that this language is unambiguous and that giving effect to its plain meaning prohibits us from superimposing upon the statute a foreseeability or proximate cause requirement."), *abrogated on other grounds by Burrage v. United States*, ---

---

[7] It was added to the federal criminal code by the Ryan Haight Online Pharmacy Consumer Protection Act of 2008, Pub. L. No. 110-425, 122 Stat. 4820, § 311(e).

U.S. ----, 134 S. Ct. 881, 892 (2014); *United States v. Robinson*, 167 F.3d 824, 832 (3d Cir. 1999) ("Plainly, if we read a particularized foreseeability requirement into [§ 841(b)(1)(C)], we would limit the applicability of the section significantly and frustrate Congress' intent."); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994) ("Quite simply, the plain language of § 841(b)(1)(C) does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event."); *see also United States v. Webb*, 655 F.3d 1238, 1250, 1254–55 (11th Cir. 2011) ("[Section] 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant."); *United States v. De La Cruz*, 514 F.3d 121, 138 (1st Cir. 2008) ("What is required under the death-enhancing statute is that the government prove cause-in-fact, that is, that the decedent's death was caused in fact by his or her use of drugs that were distributed either by the defendant himself or by others in a conspiracy of which the defendant was a part.").[8]

---

[8]     Indeed, our research has not uncovered even one circuit that has held that the "results from" language in § 841(b)(1)(C), which employs the same language as § 841(b)(1)(E), requires proof of proximate causation. We do note that the Seventh Circuit has expressed misgivings in dicta about construing § 841(b)(1)(C) as having no foreseeability or state-of-mind requirement. *See United States v. Hatfield*, 591 F.3d 945, 950–51 (7th Cir. 2010). The Seventh Circuit in *Hatfield* nonetheless conceded that the statute's plain language suggests that the omission of a foreseeability requirement was deliberate, to wit:

(continued...)

More specifically, with Congress's presumed knowledge of the uniform

holdings of our sister circuits, *see, e.g.*, *Shook v. El Paso Cnty.*, 386 F.3d 963,

970 (10th Cir. 2004) ("Congress is 'presumed to be aware' of a statute's

interpretation when it amends another part of the same statute without addressing

the part at issue." (quoting *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125,

133 n.4 (2002))), we believe that its decision to use identical language in enacting

§ 841(b)(1)(E) without codifying therein a proximate-cause requirement strongly

suggests that Congress intentionally eschewed such a requirement, *see, e.g.*,

*Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial

[8](...continued)

> We have some misgivings about interpreting "results from" in the statute to impose strict liability. That could lead to some strange results. Suppose that, unbeknownst to the seller of an illegal drug, his buyer was intending to commit suicide by taking an overdose of drugs, bought from that seller, that were not abnormally strong, and in addition the seller had informed the buyer of the strength of the drugs, so that there was no reasonable likelihood of an accidental overdose. Yet the cases are unanimous and emphatic that section 841(b)(1)(C) imposes strict liability . . . . The cases emphasize the "plain meaning" of the statute, by which they mean simply the omission of any reference to foreseeability or state of mind, and point out that criminal statutes commonly do specify the required state of mind or other ground of culpability (such as negligence) rather than leaving it to be filled in by the judges (as under the Model Penal Code, which provides that proof of guilt of a statute that does not specify a state of mind or other standard of culpability requires proof of at least recklessness). And from this they infer that *the omission of any such requirement from section 841(b)(1)(C) was deliberate*, and so liability must be strict.

*Id*. (emphasis added) (citations omitted).

18

interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Manhattan Props., Inc. v. Irving Trust Co.*, 291 U.S. 320, 336 (1934) ("From 1898 to 1932 the Bankruptcy Act was amended seven times without alteration of the section. This is persuasive that the construction adopted by the courts has been acceptable to the legislative arm of the government." (footnote omitted)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012) (in discussing the "prior-construction canon," stating "when a statute uses the very same terminology as an earlier statute—especially in the very same field . . .—it is reasonable to believe that the terminology bears a consistent meaning").[9] Moreover, Congress's subsequent amendments to

---

[9]    The Dissent opines that we "read[] too much into Congress's decision to utilize the same phrasing in § 841(b)(1)(E) that it previously utilized in § 841(b)(1)(C)." Dissent at 9. However, "[t]he normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)); *accord Law v. Siegel*, --- U.S. ----, 134 S. Ct. 1188, 1198 (2014). We are assured in the soundness of our holding here by the legion of authority that has applied this rule of consistent usage. *See, e.g.*, *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994); *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *United States v. Laureano-Perez*, 797 F.3d 45, 61 (1st Cir. 2015); *Shammas v. Focarino*, 784 F.3d 219, 224 (4th Cir. 2015); *United States v. Alabama*, 778 F.3d 926, 935 (11th Cir. 2015); *Sweeney v. Pence*, 767 F.3d 654, 660 (7th Cir. 2014); *United States v. Porter*, 745 F.3d 1035, 1042–43 (10th Cir. 2014); *Serna v. Law Office of Joseph Onwuteaka, P.C.*, 732 F.3d 440, 452 (5th Cir. 2013); *In re Consol. Freightways Corp. of Delaware*, 564 F.3d 1161,

(continued...)

19

§ 841(b) have also left § 841(b)(1)(E)'s language undisturbed, *see* Fair

Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, §§ 2, 4, further

signaling Congress's satisfaction with the meaning courts have attributed to it.

In sum, based on the foregoing, we reach the conclusion that § 841(b)(1)(E)

does *not* require proof of proximate causation.

<strong>B</strong>

In arguing against this outcome, Mr. Burkholder holds steadfastly to "the

notion that Congress makes law with an awareness of common-law rules," Aplt.

Opening Br. at 18, and asks that we interpret § 841(b)(1)(E) in light of the

traditional common-law principle that causation implies both actual (i.e., but-for)

and proximate causation. He points to three decisions—two from the Supreme

Court and one from our court—that, he claims, require us to follow the common

law and interpret "results from" to encompass proximate causation. Yet neither

the presumption against change from the common law that Mr. Burkholder raises,

*see, e.g.*, Scalia & Garner, *supra*, at 318 ("The better view is that statutes will not

be interpreted as changing the common law unless they effect the change with

---

[9](...continued)
1165–66 (9th Cir. 2009). *Compare United States v. Marshall*, 798 F.3d 296, 309 (10th Cir. 2015) (noting that the rule "might not apply because the words are not, strictly speaking, identical"), *with In re Woods*, 743 F.3d at 697 (declining to rest analysis on the rule because "the phrase as found in the [principal-residence-debt] exception has a different—in some respects more narrow—point of focus than the phrase as found in the [fifty-percent-farm-debt] rule").

clarity."), nor the cases upon which he relies, dissuade us from the view that § 841(b)(1)(E)'s "results from" language does not embody a proximate-cause requirement.

As an initial matter, while we recognize that "[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)), our earlier examination of the plain language and statutory context of § 841(b)(1)(E) reveals that Congress has actually spoken loudly and clearly: proximate cause does not play a role in § 841(b)(1)(E), *see Robinson*, 167 F.3d at 831 (in construing identical results-from language in § 841(b)(1)(C) stating, "It is *obvious* Congress intended . . . that [a] mandatory minimum would apply if death . . . resulted from the use of the substance without regard for common law proximate cause concepts." (emphasis added)); *see also Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) ("Congress need not 'affirmatively proscribe' the common law principle to evince [its] intent." (quoting *Texas*, 507 U.S. at 534)). Our analysis and conclusion are therefore consistent with this rule of statutory construction.

Moreover, none of the three cases on which Mr. Burkholder relies compels a different result. He first directs us to *Burrage v. United States*, --- U.S. ----, 134 S. Ct. 881 (2014), where the Supreme Court granted certiorari to address the

21

causation requirement imposed by 21 U.S.C. § 841(b). The Court began with the general observation that causation "consist[s] of two constituent parts: actual [i.e, but-for] cause and legal [i.e., proximate] cause," but while it held that the "results from" language "imposes . . . a requirement of actual causality," it expressly declined to decide whether the phrase also embodies a proximate-cause requirement. *Burrage*, 134 S. Ct. at 887. Thus, *Burrage* does not answer the question we face in this appeal—let alone resolve it in Mr. Burkholder's favor.

Indeed, much of the Court's discussion in *Burrage* of "results from" tends to undermine his claim. The Court specifically noted that the "ordinary meaning" of "results from" bespeaks but-for causation, *id.*, and observed that "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality," *id.* at 888; *see also id.* at 889 ("[I]t is one of the traditional background principles 'against which Congress legislate[s],' that a phrase such as 'results from' imposes a requirement of but-for causation." (second alteration in original) (citation omitted)). Therefore, Mr. Burkholder's reliance on *Burrage* is wholly misplaced.

Nor does his second Supreme Court case, *Paroline v. United States*, --- U.S. ----, 134 S. Ct. 1710 (2014), provide Mr. Burkholder any succor. There, the Court faced a statute dealing with the restitution owed to child-pornography victims; this statute *explicitly* included a proximate-cause requirement in a

22

catchall provision. *Paroline*, 134 S. Ct. at 1720. This circumstance, the court concluded, made its "interpretive task . . . easier." *Id.* In contrast, § 841(b)(1)(E)(i) does not expressly contain any similarly helpful proximate-cause language.

Furthermore, although the Court indicated that even in the absence of an "express reference to proximate causation, [it] might well [have held] that a showing of proximate cause was required," *id.*, this dicta does not avail Mr. Burkholder. While we are undoubtedly "bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," *Tokoph v. United States*, 774 F.3d 1300, 1303–04 (10th Cir. 2014) (quoting *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1540 n.10 (10th Cir. 1995)), the general possibility that the Court might read a proximate-cause requirement into another statute—in the absence of any express reference to it—does not mean that we should, much less must, do so in the context of § 841(b)(1)(E)(i), *see, e.g.*, Scalia & Garner, *supra*, at 56 (noting that "words are given meaning by their context"); *id.* at 323 ("As we have been at pains to point out through this treatise, context is as important . . . ."). Where, as here, Congress's intent to eschew a proximate-cause requirement is pellucid, our reasoned judgment indicates that Congress intended to abrogate the common-law understanding of causation. *See Texas*, 507 U.S. at 534 ("Just as longstanding is the principle that '[s]tatutes which invade the common law . . . are to be read with

23

a presumption favoring the retention of long-established and familiar principles, *except when a statutory purpose to the contrary is evident*." (alteration in original) (emphasis added) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952))); *accord Joy Techs., Inc. v. Sec'y of Labor*, 99 F.3d 991, 997 (10th Cir. 1996) (rejecting "strict adherence to the common law" in interpreting a provision of the Mine Act where doing so would be inconsistent with the statute's clear language and purpose).

Finally, Mr. Burkholder looks to our decision in *United States v. Woodlee*, 136 F.3d 1399 (10th Cir. 1998). He claims that, in that case, we read the phrase "if bodily injury results" in a felony prosecution under 18 U.S.C. § 245(b) to "*require* not just actual causation, but proximate causation as well." Aplt. Opening Br. at 20 (emphasis added). According to Mr. Burkholder, *Woodlee* and this case involve "the same thing." *Id.* We disagree.

We dispatch Mr. Burkholder's argument by zeroing in on the critical logical distinction between that case and this one, which his contentions elide: the focus in *Woodlee* was on what is sufficient for the imposition of the penalty enhancement—*not*, as here, on what is necessary. In *Woodlee*, after acknowledging at the outset that the issue presented was really one of causation and not *mens rea*, *see* 136 F.3d at 1405, the court concluded that the government was not obliged to prove that the defendants intended to cause the bodily injury in order to make them eligible for § 245(b)'s felony penalty; it was "sufficient" for

24

the government to prove that the bodily injury was (objectively) foreseeable, *id.* at 1406 (noting that "merely foreseeing some bodily injury [wa]s *sufficient*" (emphasis added)).

Yet, as a logical matter, it does not ineluctably follow from *Woodlee*'s holding that foreseeability is a *necessary* causation standard, in addition to being a sufficient one. In other words, *Woodlee* is silent regarding whether, absent a showing of foreseeability, the government would have been unable to establish a felony under § 245(b).[10] Indeed, *Woodlee* does not necessarily preclude the possibility that a less-demanding causation standard—such as but-for causation—would *also* be *sufficient* to provide the basis for a felony under § 245(b).[11] That question was not before the court in *Woodlee*, and we certainly

---

[10] An event or condition is *sufficient* if its existence means that another event or condition will occur. An event or condition is *necessary* if, in its absence, another event or condition could not occur. *See* Phillip M. Kannan, *Symbolic Logic in Judicial Interpretation*, 27 U. Mem. L. Rev. 85, 91 (1996). Thus, while *Woodlee* holds that the existence of foreseeability justifies (i.e., is sufficient for) a penalty enhancement, Mr. Burkholder asks us to hold that if foreseeability is absent, a "results from" enhancement cannot be imposed. This is patently a logically distinct matter.

[11] To be clear, *Woodlee* was addressing a discrete challenge, asking whether "the government needed to show [the defendants] *intended* to injure," when some bodily injury was foreseeable. 136 F.3d at 1405. It answered that narrow question by holding that foreseeability was sufficient. The Dissent's suggestion that simply because *Woodlee* involved a sufficiency-of-the-evidence challenge that the court must have opined on all of the elements that were necessary to establish the offense is misguided. The Supreme Court's decision in *Musacchio v. United States*, --- U.S. ----, 136 S. Ct. 709, 715 (2016), which the Dissent cites, does not come close to supporting this proposition. In our

(continued...)

25

do not address it here. But we do say that, unlike *Woodlee*, our concern in this case is not what is merely sufficient; instead, it is what is necessary. Our vantage point in this way is different than that of the panel in *Woodlee*. And, because it is, *Woodlee*'s holding regarding foreseeability does not signal, much less demand, that we disregard the clear message from § 841(b)(1)(E)'s plain language and statutory context—that is, but-for causation is all that is necessary.[12]

---

[11](...continued)
adversary, common-law system, courts properly answer only the questions that the parties present to them and that are necessary for the resolution of the case at hand. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (noting adherence to the "principle of party presentation[,]. . . . rely[ing] on the parties to frame the issues for decision"); *Utah Poultry Producers Co–op. v. Union Pac. R. Co.*, 147 F.2d 975, 977 (10th Cir. 1945) ("[I]t is not necessary for us to decide this [issue], because this is not the issue *as framed by the parties*." (emphasis added)); *see also United States v. Bader*, 678 F.3d 858, 874 (10th Cir. 2012) (noting regarding a sufficiency-of-the-evidence review of a conviction under 21 U.S.C. § 333(e) that the defendant "challenges the third of these three elements on appeal"); *United States v. Poe*, 556 F.3d 1113, 1125 (10th Cir. 2009) (noting, as to a sufficiency-of-the-evidence challenge to the offense of "possession of a firearm and ammunition after a previous felony conviction, in violation of 18 U.S.C. § 922(g)(1)" that "[o]n appeal, [the defendant] disputes the sufficiency of the evidence as to the second element"). Indeed, in reviewing an instructional challenge rooted in a sufficiency-of-the-evidence question, as here, the Court in *Burrage* had no need to decide the question of whether 21 U.S.C. § 841 contained "a foreseeability or proximate cause requirement," Pet. for Writ of Cert. (dated Nov. 27, 2012), *Burrage*, 134 S. Ct. 881 (No. 12-7515), 2012 WL 7991899, at *1, because, in holding that the district court erred in instructing the jury that use of narcotics only needed to be a contributing factor in the death, the Court simply needed to rule that such use had to be at least a but-for cause of the death, *see Burrage*, 134 S. Ct. at 887.

[12]    Mr. Burkholder cites to decisions from other circuits that also address whether the foreseeability of injury or death, *rather than intent*, is *sufficient* to impose a particular penalty. *See, e.g.*, *United States v. Hayes*, 589

(continued...)

26

In sum, where Congress has unambiguously expressed a desire to deviate from background common-law principles, we must give effect to this intent. Here, we are convinced that the plain language and statutory context of the "results from" language in § 841(b)(1)(E) reveal a clear Congressional choice to forgo a proximate-cause requirement.

## C

We thus hold that § 841(b)(1)(E)'s provision that "death . . . results from the use" of a Schedule III controlled substance requires only proof of but-for causation. As such, the district court did not err in rejecting Mr. Burkholder's request for a proximate-cause jury instruction. The instruction the court did give—*viz.*, that "but for Kyle Dollar ingesting the buprenorphine distributed by the Defendant, Kyle Dollar would not have died," R., Vol. I, at 111—was a legally adequate statement of the law.

## III

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

[12](...continued)
F.2d 811, 821 (5th Cir. 1979); *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976). These cases are similarly inapposite to our inquiry into whether foreseeability is *necessary* to impose the penalty enhancement contemplated by § 841(b)(1)(E).

No. 13-8094, <u>United States v. Burkholder</u>

**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent. Unlike the majority, I am not convinced that the "results from" language of 21 U.S.C. § 841(b)(1)(E) unambiguously reveals Congress's intent "to forgo a proximate-cause requirement" and impose strict liability on criminal defendants. Maj. Op. at 27. As a result, I am left with "substantial doubt that the jury" in Burkholder's case "was fairly guided," and I therefore would reverse the district court's judgment and remand for a new trial. <u>United States v. Banks</u>, 761 F.3d 1163, 1185 (10th Cir. 2014) (internal quotation marks omitted).

**I**

At issue in this appeal is whether the district court properly instructed the jury regarding the necessary findings it had to make in order to convict Burkholder of violating 21 U.S.C. § 841(b)(1)(E), the penalty enhancement provision that was alleged in the indictment in this case. Section 841(b)(1)(E) provides, in pertinent part, as follows:

> [A]ny person who violates subsection (a) of this section shall be sentenced as follows:
> * * *
> (E)(i) Except as provided in subparagraphs (C) and (D), in the case of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 10 years and <u>if death or serious bodily injury results from the use of such substance</u> shall be sentenced to a term of imprisonment of not more than 15 years . . . .

21 U.S.C. § 841(b)(1)(E)(i) (emphasis added).

"Because th[is] 'death results' enhancement increased the . . . maximum sentence[] to which [Burkholder] was exposed, it is an element that must be submitted to the jury

and found beyond a reasonable doubt." Burrage v. United States, 134 S. Ct. 881, 887 (2014). Generally speaking, that element requires the jury to find "death caused by ('resulting from') the use of th[e] drug" distributed by the defendant. Id. The more difficult question, and the one posed by Burkholder in this appeal, is whether, as part of that finding, the jury must find that the "the victim's death was a foreseeable result of the defendant's drug-trafficking offense." Id. In other words, did Congress intend for the "death results" provision of § 841(b)(1)(E) to require a showing of proximate cause, or did it instead intend to impose strict liability on a criminal defendant whose drug-trafficking offense results in death or bodily injury to someone else?

## II

The Supreme Court granted certiorari in Burrage to address the very same question regarding the identically-worded "death results" provision of § 841(b)(1)(C). The Court ultimately found it unnecessary to reach this issue because it concluded, as a preliminary matter, that the "death results" provision imposes an actual cause (but for) requirement and that the government's evidence which proved only a "contributing cause" failed to satisfy that requirement. Despite not reaching the proximate cause issue, however, Burrage provides useful guideposts for our review in this case.

At the outset of its analysis, the Supreme Court in Burrage noted that "[t]he law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause." Id. The Court explained that "[w]hen a crime requires 'not merely conduct but also a specified result of conduct,' a defendant generally may not be

2

convicted unless his conduct is 'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'" Id. (quoting 1 Wayne LaFave, Substantive Criminal Law, § 6.4(a) (2d ed. 2003)). As noted, the Court resolved the question of whether the "death results" language includes an actual cause requirement, but left open the question we now face: whether this language also includes a legal cause requirement.

In resolving the actual cause issue, the Court in Burrage examined and interpreted precisely the same language we are now tasked with interpreting. In doing so, the Court noted that "[t]he Controlled Substances Act does not define the phrase 'results from,'" and thus the Court began by "giv[ing] it its ordinary meaning." Id. "A thing 'results,'" the Court noted, "when it '[a]rise[s] as an effect, issue, or outcome from some action, process or design.'" Id. (quoting 2 The New Shorter Oxford English Dictionary 2570 (1993)) (emphasis omitted).

But the Court did not stop there in interpreting the phrase's meaning. It instead looked to the Model Penal Code's "traditional understanding" of cause in the criminal setting, id. at 888, to the "common understanding of cause," id., and to case law interpreting "phrases like 'results from,'" id., in order to determine "the traditional background principles 'against which Congress legislate[s],'" id. at 889 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013)). The Court also invoked the "rule of lenity" in rejecting the government's proposed, and less demanding, interpretation of the "results from" language. Id. at 891. All of which suggests that the Court, in contrast to the majority in this case, viewed the "results from" language as

3

ambiguous in terms of addressing causation.[1]

## III

Because we are faced in this appeal with interpreting the same statutory language (albeit in a different subsection of the same statute), I believe that we are best served by following, if not bound to adhere to, the analytical framework outlined in Burrage. Treating the statutory language at issue as ambiguous, I therefore turn first, as did the Court in Burrage, to the traditional background principles against which Congress legislates, and which it must take into account, in imposing criminal liability.

One of the leading treatises on criminal law, and the one specifically cited in Burrage, states that where a criminal offense requires proof of "a specified result of conduct, the defendant's conduct must be the 'legal' or 'proximate' cause of the result." LaFave, supra, § 6.4.

The Model Penal Code, which the Court also referenced in Burrage, states, with regard to strict liability offenses: "[w]hen causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct." Model Penal Code § 2.03(4) (Am. Law Inst. 2001). In other words, the Model Penal Code "provides that the causal element is not established" for strict liability offenses "unless the actual

---

[1] To be sure, the Court did not expressly declare the statutory language ambiguous. But neither did the Court declare the language to be clear and unambiguous. And it invoked several recognized principles of statutory analysis in reaching its ultimate conclusion. Considering the Court's analysis in its entirety, I am left to conclude that it considered the statutory language to be ambiguous.

result is a probable consequence of the actor's conduct, a minimal protection against the limitless extrapolation of liability without fault." Id., cmt.

As for case law, the Supreme Court has long held that strict-liability criminal offenses are "generally disfavored," and that "[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement."[2] United States v. U.S. Gypsum Co., 438 U.S. 422, 438 (1978). Indeed, the Supreme Court has stated that the simple "omission . . . of intent [in a criminal statute] will not be construed as eliminating that element from the crimes denounced," and "instead Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor." Id. at 437. Consequently, the Supreme Court, "in keeping with the common-law tradition and with the general injunction that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity, has on a number of occasions read a state-of-mind component into an offense even when the statutory definition did not in terms so provide." Id.

---

[2] Based apparently on my citation to U.S. Gypsum, the majority asserts that I have "mistakenly cast[] [their] holding . . . as stripping away § 841's mens rea requirement." Maj. Op. at 9 n.5. This is incorrect. The point of the citation and the related discussion is merely to outline the Supreme Court's general approach to statutes that impose strict criminal liability. And, most importantly, the focus of my dissent, as with the majority opinion, is on the issue of causation. On that issue, we should acknowledge that the majority's interpretation of § 841(b)(1)(E) effectively imposes strict liability "with respect to the injury or death of another arising out of the distribution of drugs." United States v. Rebmann, 226 F.3d 521, 525 (6th Cir. 2000), overruled on other grounds by United States v. Leachman, 309 F.3d 377, 385 n.9 (6th Cir. 2002).

5

The Supreme Court has also generally outlined "[t]he situations in which strict [criminal] liability may be imposed":

> (W)here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent.

United States v. Freed, 401 U.S. 601, 613 n.4 (1971) (Brennan, J., concurring in the judgment) (quoting Holdridge v. United States, 282 F.2d 302, 310 (8th Cir. 1960)).

As far as I can determine, the Supreme Court has not abandoned these principles. For example, in Paroline v. United States, 134 S. Ct. 1710 (2014), the Supreme Court recently considered whether 18 U.S.C. § 2259(a), which states that a district court "shall order restitution for any offense" under Chapter 110 of Title 18 (covering a number of offenses involving the sexual exploitation of children), "limits restitution to those losses proximately caused by the defendants' offense conduct." 134 S. Ct. at 1719. In doing so, the Court noted generally, as it did in Burrage, that "[p]roximate cause is a standard aspect of causation in criminal law," and it in turn stated that, "[g]iven proximate cause's traditional role in causation analysis, [it] ha[d] more than once found a proximate-cause requirement built into a statute that did not expressly impose one."[3] Id. at 1720; see Dean v. United States, 556 U.S. 568, 581 (2009) (Stevens, J., dissenting) ("[a]bsent a clear

___

[3] The Court ultimately did not read a proximate cause requirement into § 2259(a) because it concluded that "the requirement of proximate cause [wa]s in the statute's text." 134 S. Ct. at 1720.

indication that Congress intended to create a strict liability enhancement, courts should presume that a provision that mandates enhanced criminal penalties requires proof of intent.").

Considering the bare language of § 841(b)(1)(E) in light of these principles, I am not persuaded that Congress clearly intended to impose strict liability on a criminal defendant for any death resulting from his drug-trafficking offense. In other words, I believe that Congress would have had to say more in § 841(b)(1)(E) in order for us to reasonably conclude that it intended to abandon the background principles outlined above and impose strict criminal liability.[4]

## IV

The majority stakes its conclusion, in part, on what it characterizes as the "plain language . . . of the 'results from' language in § 841(b)(1)(E)." Maj. Op. at 27. But that characterization of the "results from" language is seemingly at odds with the Supreme Court's own characterization of the same language in Burrage. And, by stating that its interpretation is tethered to the "plain language" of the statute, the majority is most

---

[4] The legislative history of § 841 is silent regarding the issue of causation. For example, a House Report (No. 99-845) that accompanied the Narcotics Penalties and Enforcement Act of 1986 stated, under the heading "PURPOSE OF THE LEGISLATION," that "[t]his bill substantially increases the penalties in the Controlled Substances Act and the Controlled Substances Import and Export Act." The same report, under the heading "BACKGROUND," stated simply that "[t]he bill also provides a special term of imprisonment if death or serious bodily injury results from violating the manufacture or distribution offenses." Nowhere in the House Report (or any other available legislative history) did Congress discuss, in connection with the enhanced penalty provisions of § 841, the concepts of strict liability, proximate cause, or foreseeability of injury/death.

7

assuredly at odds with its decision to then "[b]roaden [its] analytical lens" and look beyond the statutory language for other signs of Congressional intent.⁵ Id. at 13. Generally speaking, only ambiguity or the possibility of an odd result compels a court to look beyond the language of the statute it is interpreting. E.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 99 (2007) (concluding that statutory language was susceptible to more than one meaning); Public Citizen v. Dep't of Justice, 491 U.S. 440, 454 (1989) (holding that a court can look beyond the statutory language when plain meaning would "compel an odd result").

In looking beyond the statutory language, the majority curiously downplays the relevance of Burrage and ignores the above-cited background sources in favor of other, less-persuasive sources. For example, the majority cites to our decision in United States v. Cardena-Garcia, 362 F.3d 663, 666 (10th Cir. 2004), and the Fifth Circuit's more recent decision in United States v. Ramos-Delgado, 763 F.3d 398, 401 (5th Cir. 2014).

---

⁵ I agree with the majority "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989). But that does not explain the majority's "survey of federal criminal statutes" other than § 841. Maj. Op. at 15. And in the end, the other statutes cited by the majority really tell us nothing about the meaning of § 841.

As for my reliance on "extra-textual sources," Maj. Op. at 15 n.6, that is entirely consistent with my conclusion that the language of § 841(b)(1)(E) is ambiguous with respect to the issue of proximate causation. See Milner v. Dept. of Navy, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous [statutory] text."); United States v. Hayes, 555 U.S. 415, 436 (2009) (Roberts, C.J., dissenting) (concluding that where the statutory text "is ambiguous, the structure [of the statute] leans in the defendant's favor, the purpose leans in the Government's favor, and the legislative history does not amount to much," the "rule of lenity" must be applied). It is also, as I have indicated, consistent with the Supreme Court's analytical approach to the very same statutory language.

8

According to the majority, these two cases stand for the principle that the phrase "results from" imposes only but-for, and not proximate, causation. Notably, however, both of these cases dealt with language found in the United States Sentencing Guidelines, rather than the language of a statute imposing criminal liability. As a result, these two cases are inapposite.

The majority also (and again in conflict with its conclusion that the statutory language is unambiguous) makes much of the fact that "Congress included the language at issue here—*viz.*, "death . . . results from the use"—in 2008, *after* our sister circuits uniformly had held that identical language in § 841(b)(1)(C) lacked a proximate-cause element." Maj. Op. at 16 (emphasis in original). It is true that, prior to the enactment of § 841(b)(1)(E), every circuit court that considered the issue concluded that § 841(b)(1)(C) did not include a proximate cause requirement. But none of these circuits considered the background principles outlined above, especially the rule of lenity or the Supreme Court's tendency to view strict criminal liability offenses with disfavor. Nor did any of these circuits have the benefit of the Supreme Court's analysis in Burrage. In any event, the majority does not explain how Congress could reasonably have eschewed these long-established background principles, particularly the ones expressly outlined in Supreme Court precedent, in favor of a handful of lower-court decisions. And, finally, the majority's conclusion reads too much into Congress's decision to utilize the same phrasing in § 841(b)(1)(E) that it previously utilized in § 841(b)(1)(C). When Congress first selected the phrase "results from" for use in § 841(b)(1)(C), it had only the benefit of

9

the background principles outlined above, all of which weigh against the imposition of strict criminal liability. And there were no cases or other authorities that I am aware of that would have led Congress to believe that the "results from" language it chose to use in § 841(b)(1)(C) unambiguously conveyed the intent to impose strict criminal liability. Consequently, I am not persuaded that we can fairly interpret Congress's use of that same phrase in § 841(b)(1)(E) as establishing its intent to impose strict criminal liability. For, as we know, it is exceedingly common and entirely logical for Congress to use the same phrasing in different subsections of the same statute.[6]

## V

There is another, entirely separate reason—existing Tenth Circuit precedent—that I believe compels us to conclude in this case that § 841(b)(1)(E) incorporates a proximate-cause requirement. In United States v. Woodlee, 136 F.3d 1399 (10th Cir. 1998), two defendants challenged the sufficiency of evidence supporting their convictions for violently interfering with federally-protected activity, in violation of 18 U.S.C. § 245(b). That statute criminalizes, in pertinent part, the use of "force or threat of force [to] willfully injure[], intimidate[] or interfere[] with . . . any person because of his race . . . and because he is or has been . . . enjoying the goods, services, facilities, privileges,

---

[6] I agree with the majority that "identical words used in different parts of the same act are intended [by Congress] to have the same meaning." Helvering v. Stockholm Enskilda Bank, 293 U.S. 84, 87 (1934). What I take issue with is the majority's conclusion that Congress's "decision to use identical language in enacting § 841(b)(1)(E) without codifying therein a proximate-cause requirement strongly suggests that Congress intentionally eschewed such a requirement." Maj. Op. at 20.

10

advantages, or accommodations of any . . . facility which serves the public." 18 U.S.C. §

245(b). The statute's penalty provision states that the defendant "shall be fined under this

title, or imprisoned not more than one year, or both; and if bodily injury results . . . shall

be fined under this title, or imprisoned not more than ten years, or both." Id. (emphasis

added).

In considering and rejecting the defendants' argument that there was insufficient

evidence for them to be penalized for the victim's undisputed injuries, this court held that

the statute required proof that the bodily injury was a foreseeable, rather than intentional,

result of the rights-violating conduct. Woodlee, 136 F.3d at 1405. At no point did this

court even consider the possibility that the statute might not require proof of

foreseeability at all, i.e., that the statute imposed strict liability on a defendant for bodily

injury resulting from his conduct.[7]

Because there is no logical distinction between the statutory language at issue in

---

[7] The Fifth Circuit reached a similar conclusion in United States v. Hayes, 589 F.2d 811 (5th Cir. 1979). There, the Fifth Circuit considered the elements necessary for a conviction under 18 U.S.C. § 242. Section 242 makes it a crime for a person, acting under color of state law, to deprive another person of their constitutional rights, or to subject another person to "different punishments, pains, or penalties, on account of such [person] being an alien, or by reason of his color, or race." 18 U.S.C. § 242. Similar to the statute at issue in Woodlee, § 242 provides for an increased term of imprisonment "if death results" from the defendant's actions. Id. The Fifth Circuit concluded that this sentence enhancement provision "requir[es] the additional element that death ensued as a proximate result of the accuseds' willful violation of a victim's defined rights." 589 F.2d at 820 (emphasis added). The Fifth Circuit explained that "[a] fundamental principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct" and "[t]hus, where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken and the perpetrator is held criminally responsible for the resulting harm." Id. at 821.

11

<u>Woodlee</u> and the language of § 841(b)(1)(E) that we are now tasked with interpreting, I believe that we are bound by <u>Woodlee</u> to interpret § 841(b)(1)(E) as incorporating a proximate cause requirement.  <u>See</u> <u>United States v. Ensminger</u>, 174 F.3d 1143, (10th Cir. 1999) (holding that one panel of this court is bound by the precedent of an earlier panel absent en banc reconsideration or a superseding contrary decision of the Supreme Court). To conclude otherwise creates an intra-circuit conflict.

In an attempt to avoid this conflict, the majority suggests there is a "critical logical distinction between" the two cases because "the focus in *Woodlee* was on what is sufficient for the imposition of the penalty enhancement—*not*, as here, on what is necessary."  Maj. Op. at 24 (italics in original).  The majority explains that "it does not ineluctably follow from *Woodlee*'s holding that foreseeability is a *necessary* causation standard, in addition to being a sufficient one."  <u>Id.</u> at 25 (italics in original).[8]  "Indeed," the majority asserts, "<u>Woodlee</u> does not necessarily preclude the possibility that a less-demanding causation standard—such as but-for causation—would *also* be *sufficient* to provide the basis for a felony under § 245(b)."  <u>Id.</u> (italics in original).

The majority's proffered distinction, however, cannot withstand close scrutiny. When we review a sufficiency-of-the-evidence challenge, as this court did in <u>Woodlee</u>, we necessarily focus on the "essential elements of the crime" and, in turn, the minimum

---

[8]  In support, the majority cites only to an obscure, and I would submit irrelevant, law review article that discusses the concepts of symbolic logic.  Maj. Op. at 25 n.10 (citing Phillip M. Kannan, <u>Symbolic Logic in Judicial Interpretation</u>, 27 U. Mem. L. Rev. 85, 91 (1996)).

proof necessary for conviction under that statute. <u>Musacchio v. United States</u>, 136 S. Ct. 709, 715 (2016) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)). In other words, and contrary to the majority's suggestion, "[s]ufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" <u>Id.</u> (quoting <u>Burks v. United States</u>, 437 U.S. 1, 16 (1978) (emphasis deleted)). As a result, the decision in <u>Woodlee</u> necessarily means that a showing of foreseeability is an essential element of proof under § 245(b) and that any lesser-showing of proof by the government will fail.[9]

## VI

For these reasons, I conclude that the district court failed to properly instruct the jury in Burkholder's case regarding the essential elements of § 841(b)(1)(E). I therefore would reverse the judgment of the district court and remand the case to the district court for a new trial.

---

[9] I agree with the majority that "courts properly answer only the questions that the parties present to them and that are necessary for the resolution of the case at hand." Maj. Op. at 27 n.11. In <u>Woodlee</u>, the court was asked to, and did in fact, address the proof necessary to satisfy "the bodily injury element" of § 245(b). 136 F.3d at 1406. As noted, the court held that the victim's "injury" had to be "a foreseeable result" of the defendants' criminal conduct. That holding does not, contrary to the majority's suggestion, leave open the possibility that a lesser showing might somehow suffice.